# UNITED STATES *v.* BERDAN FIRE–ARMS MANUFACTURING COMPANY.

# BERDAN FIRE–ARMS MANUFACTURING COMPANY *v.* UNITED STATES.

## APPEALS FROM THE COURT OF CLAIMS.

Nos. 128, 135. Argued January 7, 8, 1895. — Decided March 4, 1895.

Even if there were findings sufficient to show that the United States had in any manner infringed letters patent No. 52,925, granted February 27, 1866, to Hiram Berdan for an improvement in breech-loading fire-arms, in the absence of anything disclosing a contract the use would be a tort, creating no cause of action cognizable in the Court of Claims.

Where several elements, no one of which is novel, are united in a combination which is the subject of a patent, and these several elements are thereafter united with another element into a new combination, and this new combination performs a work which the patented combination could not perform, there is no infringement.

As to letters patent No. 88,436, granted to Hiram Berdan March 30, 1869, for an improvement in breech-loading fire-arms, it appears that the use of that invention was with the consent and in accordance with the wish of the inventor and the Berdan Company, and with the thought of compensation therefor, which facts, taken in connection with other facts referred to in the opinion, establish a contractual relation between the parties sufficient to give the Court of Claims jurisdiction.

The contract was not a contract to pay at the expiration of the patent, but the right to recover accrued with each use, and the statute of limitations is applicable to all uses of the invention prior to six years before the commencement of the action.

The Court of Claims did not err in fixing the amount of the royalty.

THESE are cross-appeals from a judgment of the Court of Claims, entered December 8, 1890, in favor of the petitioner against the United States, for the sum of $95,004.86. The case as it was presented in the Court of Claims contained two distinct causes of action, each founded upon a patent issued to Hiram Berdan and by him assigned to petitioner. The first patent was dated February 27, 1866, being No. 52,925, and entitled "improvement in breech-loading fire-arms." The

second was dated March 30, 1869, being No. 88,436, and entitled in the same way.   The court found against the petitioner in respect to the first cause of action, and in its favor on the second. · The findings of facts made by that court are quite voluminous, and it would needlessly encumber this statement to quote them all at length.

In reference to the first of these causes of action it will be sufficient to note these facts, taken from the findings, and which present all that is necessary for a determination of the questions involved.   In January, 1866, the Secretary of War convened a board of officers of the army, of which General Hancock was named as president.   This board, known as the Hancock board, was "ordered to examine thoroughly the following questions and make recommendations thereon:

"(1) What form and caliber of breech-loading arm should be adopted as a model for future construction of muskets for infantry?

"(2) What form and caliber should be adopted as a model for future construction of carbines for cavalry?

"(3) What form of breech-loading arm should be adopted as a model for changes of muskets, already constructed, to breech-loading muskets?

"Each person who submits an arm to the above board will be required to state in writing the lowest price at which it will be furnished in the event of its being adopted by the government."

It met at Washington on March 10, 1866.   In the same month it issued a circular to the public, with the following blank form of proposal, to be signed by those presenting arms for trial:

"————  ————, of ———, being the proprietor of the patent right to manufacture a breech-loading arm, known as ———, do hereby bind ——— heirs, executors, and assigns, to grant to the United States government, if called on within three years from this date to make such grant, the right to manufacture the aforesaid breech-loading arm on the following terms, viz. :

"For payment to ——— of ——— dollar per arm for the

privilege of manufacturing fifty thousand; of ——— dollar per arm for the privilege of manufacturing one hundred thousand; of ——— dollar per arm for the privilege of manufacturing two hundred thousand; and of ——— dollar per arm for the privilege of manufacturing any additional number of arms; provided, that when the government shall have paid the total amount ——— dollars, counting each and every payment, then it shall have the full and entire privilege of manufacturing ——— patented arms, for its own use, without further payment to ——— on account of ——— patent right. Each payment, as above specified, to be made for not less than five thousand arms. Or, by the payment of ——— dollars within three years from this date, the privilege of manufacturing as many arms as may be desired shall be granted to the United States."

In response to the circular the petitioner, among others, on March 27, 1866, forwarded a communication, a part of which is as follows:

"The Berdan Fire-arms Co., of New York, New York, being the proprietor of the patent right to manufacture a breech-loading arm known as the Berdan breech-loader, do hereby bind ourselves, heirs, executors, and assigns, to grant to the United States government, if called on within three years from this date to make such grant, the right to manufacture the aforesaid breech-loading arms on the following terms, viz.:

"For payment to us of two dollars per arm for the privilege of manufacturing fifty thousand; of one and three-quarters dollars per arm for the privilege of manufacturing one hundred thousand; of one and one-half dollars per arm for privilege of manufacturing two hundred thousand; and of one and one-quarter dollars per arm for the privilege of manufacturing any additional number of arms."

Later, and on May 21, 1866, it presented a gun, called No. 4, which, while similar in many respects to the one described in the specifications and drawings of the patent No. 52,925, differed in others. One of such differences is thus stated in the latter part of the fifth finding:

"A friction plunger (which did not exist in the patented gun) was placed in the gun (No. 4) shown the Hancock board; this plunger appeared in the middle of the bottom of the breech-receiver, close to the barrel's mouth, and was so placed that when the gun was loaded the spring was held up against the cartridge head and in contact with it by a flat spring placed underneath the barrel. The friction plunger was introduced for the reason stated in finding XIII."

Finding No. 8 is as follows:

"June 4, 1866, the said board of officers concluded its labors and made a final report to the Secretary of War, which contained this recommendation and statement, namely: 'Fourth. This board recommends the plan of alteration submitted' by H. Berdan. This gives the stable breech pin, secures the piece against premature discharge, and involves only a slight change of our present pattern of arms.'"

In finding No. 9 is this statement:

"No gun has been bought by the government from defendants (petitioner?) and no gun has been manufactured by the government which is a copy of the gun recommended by the Hancock board."

Findings 11, 12, and 13 disclose these facts:

"11. Several models of Springfield arms have been placed in evidence, and as to them we find: The model of 1865 was the Allin gun. The model of 1866 (finding XII) was a tight-jointed mechanism, and except for the ejector device, elsewhere described in these findings, the Berdan model has no bearing upon this case. The loose-jointed mechanism appeared in 1868, with the new ejector device elsewhere in these findings described. For the purposes of this action the model of 1868 and those subsequent are alike, and for these purposes the description given in these findings of the Springfield gun applies to all models subsequent to that of 1866.

"12. The Berdan gun (patent 52,925) was not loose-jointed; when the breech-block was down there was no play, for then the block abutted against the barrel at one end and the brace against the breech-screw at the other; Berdan, by joining his block (making thus a block and brace) procured a square recoil

shoulder against the end of the breech-pin; but he did not procure any play in the parts; there were elongated holes in the plate fastening of his breech-block, as shown in the Patent Office model, a device replaced in the gun shown the Hancock board (No. 4) by a band which has a minute slip upon the barrel under strong pressure; but neither the holes nor the band are claimed to give, nor do they give, looseness of construction; they merely take up slight wear of the parts. It is admitted that no single element in patent 52,925 is new. The combinations shown in claims 1, 2, 4, and 5 were novel and useful.

"13. The Berdan extractor (patent 52,925) was intended for rim-fire cartridges; with those cartridges it was successful; it was not successful when used with centre-fire cartridges, for this reason: The flange of the rim-fire cartridges expanded somewhat at the time of explosion, and the shell thus took a firm seat in the barrel. This expansion did not occur in the centre-fire cartridges, and therefore the shell was pressed back by the ejector spring in proportion to the speed with which the breech-block was raised; the movement thus communicated to the cartridge was therefore not sufficiently fast to throw the cartridge out of the receiver. To counteract this difficulty, Berdan introduced the friction plunger into the receiver just behind the cartridge-head, thus counteracting the backward pressure of the spring until the breech-block was open sufficiently to allow the shell to clear the face of the breech-block when ejected, so that the motion backward should not be impeded by the intervening breech-block. This friction plunger, singly or in combination, was not patented by Berdan.

"It appears that the ejector in patent 52,925 would only operate when a rim-fire cartridge was used. The government uses centre-fire cartridges."

Patent No. 88,436 was for what is called an extractor ejector. In reference to the cause of action under this patent, findings 16, 17, and 19 are as follows:

"16. Extraction and ejection of cartridges was thus performed in all Springfield guns, beginning with the model of 1868, and continuing since.

"Extraction : By an extractor plate swinging on the hinge-pin, and struck above its centre of motion by the forward end of the breech-block near the completion of its movement in opening.

"Ejection : By accelerating the movement of the extractor by means of a spiral ejector spring which surrounds the stem of the ejector spindle, and bears against the bottom of its hole in the receiver at one end, and against the head of the spindle at the other end. When the extractor is revolved by the opening of the block, the ejector spring is compressed by the ejector spindle, the point of which rests in a cavity in the back of the extractor above its axis of motion. The continued revolution of the extractor finally brings the prolengation of the ejector spindle below the axis of motion ; as soon as the centre is passed the sudden release of the ejector spring causes the extractor to rapidly rotate about its axis and to carry the empty cartridge shell against the bevelled surface of the ejector stud, by which it is deflected upward and thrown clear of the gun.

"This specific device was perfected by Benjamin F. Adams, an employé in the Springfield Armory. He invented it in the autumn of 1868.

"17. The extraction and ejection of cartridges was thus performed in the Russian-Berdan gun, patent No. 88,436.

"Extraction : By an extractor swinging on the joint screw and struck above its centre of motion by the forward end of the breech-block nearer the completion of its movement in opening.

"Ejection : By accelerating the movement of the extractor by the ejector spring, one end of which has a solid bearing on the hinge strap slide, and the other resting on the extractor above the centre of motion, causes the spring to be compressed by the movement of the latter until the direction of the resistance passes below the centre of motion ; the sudden release of the spring then throws out the extractor, carrying with it the shell, which in passing out is deflected by the bevelled surface of the ejector stud, and is thus thrown clear of the piece.

"The only difference between the Berdan and Adams devices is that Berdan used a flat spring while the government

used a spiral spring with a spindle or plunger; both perform the same office and attain the same result in the same way; the use of the flat spring or of the spiral spring is matter of choice, and is in no way material to the result.

"Adams, when he made his invention, was ignorant of Berdan's prior invention.

"19. The War Department is early and regularly informed of all improvements and inventions in fire-arms and ammunition. It is aware of the state of the art at all times, and generally knows of all patents upon fire-arms as soon as issued.

"The attitude of the War Department towards inventors in ordnance has been one of neutrality; it has neither denied nor admitted the legal rights, if any there were, of inventors; in an endeavor to perfect the government arm that department has taken advantage of all knowledge within its reach and of all inventions; it does not deny the claims of inventors, but has proceeded upon the policy that executive officers should not decide upon such claims against the government or upon conflicting claims, but that the claim should be presented without prejudice before some other tribunal than an executive department. Berdan, as an officer of plaintiffs herein, assignees of his inventions during the period covered by this action, was in constant communication with the ordnance officers, requesting the use of his devices by the government; they knew him as an inventor and knew his inventions as soon as they were patented. In 1867, it was known that Berdan was at work upon an ejector, and in August, 1868, that he had applied for patents for improvements in fire-arms, but it does not appear that prior to issue of patent the ordnance officers knew of the specific devices protected by letters patent No. 88,436, issued March 10, 1869, upon application filed July 21, 1868, except as hereinafter appears."

Finding 23 contains these statements:

"In 1867, during the autumn, Berdan showed to Colonel Benton, commandant of the Springfield Armory, at the armory, a transformed musket, containing the extractor-ejector subsequently described in the specifications and claims of patent number 88,436. Colonel Benton then and there examined and

tested the device ; he neither approved nor disapproved it; his attitude was neutral.

" August 3 or 4, 1868, Berdan had a conversation with General Dyer, then Chief of Ordnance, in the Ordnance Office, upon the subject of his devices. During this conversation the Chief of Ordnance said, in substance, that he had recommended that some steps should be taken or some court constituted for the purpose of determining the value of the various claims for devices used in the Springfield gun, the army officers (in his opinion, he said) being powerless to settle the question.

" Berdan's application for patent No. 88,436 was then pending in the Patent Office, and Berdan explained generally its features. The Chief of Ordnance said, in substance, that if any of the features should be used by defendants in the Springfield gun, the ordnance officers expected to pay for them when the claimant had gone through the proper channels and settled the claim.

" While this application for patent 88,436 was pending in the Patent Office the following letters were written : ·

" 'WASHINGTON, *August 3*, 1868.

" ' GENERAL: I hold some patents on the system of converting muzzle-loading muskets into breech-loaders, recently adopted by the United States. I am also the inventor of other points in the same system not yet patented, but applications for which have been made some time since, and I am now informed that the business of this branch of the Patent Office is some five months behindhand, and that my application would be acted upon at once on a receipt of a note from the department that it is desirable that these applications should be disposed of to enable me to present my claim to the government for the use of said patent.

" ' Trusting that you will grant me this favor,

" ' I am, very respectfully, your obedient servant,

" ' H. BERDAN.

" ' Bvt. Maj. Gen. A. B. DYER,
" ' *Chief of Ordnance.*'

" ' WAR DEPARTMENT, WASHINGTON CITY,

" ' *August* 12, 1868.

" ' SIR : I have the honor to transmit herewith a communication, dated the 3d instant, from H. Berdan, asking that his application for patents for various improvements in firearms be acted upon immediately by the Patent Office, in order that he may present his claims against this department for its use of said inventions, and to state that so far as this department is concerned the early consideration of the aforesaid claims is regarded as being desirable.

" ' Very respectfully, your obedient servant,

" ' J. M. SCHOFIELD,

" ' *Secretary of War.*'

\*        \*        \*        \*        \*

" The Berdan extractor and ejector device (patent 88,436) was exhibited in competition with other guns to a board of officers detailed to test guns and called the ' Terry board,' in the year 1873 ; in the report of that board the device was fully described. General Benét became Chief of Ordnance in June, 1874, and has since held this position ; he understood the Springfield device for extracting and ejecting the shell, as described in the 'Terry' report, as ' seemingly identical, certainly the mechanical equivalent,' of Berdan's device for the same subject, covered by patent 88,436. After the decision of the case of *McKeever* v. *The United States*, in this court (December term, 1878, 14 C. Cl. R., p. 396) General Benét has been of this ' decided opinion : '

" ' First. That the Supreme Court having given the opinion in the case of *Seymour* v. *Osborne*, (11 Wallace U. S. S. C. Reports, p. 533,) that " inventions secured by letters patent are property in the holder of the patent, and are as much entitled to protection as any other property, consisting of a franchise during the terms for which the franchise or the exclusive right is granted ; " that patent rights are private property and cannot be taken by the United States without due compensation ; and,

"'Second. That a use of an invention protected by a patent is the use of private property that must be paid for, and, therefore, an implied contract that has a place in court, and that if the validity of the patent is sustained, and its use by the government is proved to the satisfaction of the court, the inventor must be paid.'

"General Benét, 'with this understanding,' continued the manufacture of the Springfield gun, containing the disputed ejector and extractor device, after adjournment of the 'Terry board,' with the expectation that if the court sustained a claim by Berdan against the government upon his patent No. 88,436, then the government must pay him for the use of his invention. Plaintiffs have desired that the government should use their patented devices and have also desired and requested compensation for such use.

"Upon the foregoing facts the court find that since 1874 the Berdan extractor-ejector device (described in patent No. 88,436) has been used by defendant's ordnance officers knowingly and without claim of adverse right, believing the device in the Springfield gun to be the device, or the mechanical equivalent of the device, covered by said letters patent, and with the anticipation that should the understanding of the said ordnance officers as to plaintiff's rights be judicially decided to be correct the defendant would compensate plaintiffs for such use."

*Mr. Assistant Attorney General Conrad,* for the United States, said, upon the question of a contract:

In the case of *Palmer v. United States,* 128 U. S. 262, 269, Palmer had exhibited his invention to a board of army officers, which recommended its adoption, and the Secretary of War adopted the device as a part of the equipment of infantry. The government thereupon manufactured and used the patented invention. Action being brought to recover royalty upon the theory of an implied contract, plaintiff was successful; and on appeal to the Supreme Court the judgment

was affirmed. Mr. Justice Bradley, delivering the opinion of the court, said :

"The government used the claimant's improvements with his consent; and certainly with the expectation on his part of receiving a reasonable compensation for the license. This is not a claim for an infringement, but a claim of compensation for an authorized use. . . . The claimant in this case invited the government to adopt his patented infantry equipments and the government did so. It is conceded on both sides that there was no infringement of the claimant's patent, and that whatever the government did was done with the consent of the patentee and under his implied license."

The government is altogether willing that its liability to the demand made here shall be determined by the tests suggested in the foregoing opinion. It submits that from the findings of fact in this case it is ascertained that it not only did not "use claimant's improvements with his consent," but did not use them at all and expressly declined to use them. It submits that this is not a "claim of compensation for authorized use," but is clearly and distinctly a "claim for an infringement." The sole basis of this claim, as appears as well from claimant's petition as from the opinion of the court, is that the government is liable, not because it has used Berdan's device, but because in using Adams's device, it has used a mechanical equivalent to Berdan's. This fact, considered in connection with the further fact that upon competitive trial it expressly rejected Berdan's and chose Adams's device, would seem to be conclusive of the character of its liability (if any) in this case; that is, that it is a liability for an infringement and not a liability upon a contract.

We do not mean to be understood as saying that the government may not be held liable for its appropriation and use of the patented invention of another. What we do mean to say is, that such liability can only arise under conditions from which a contract, promise, or undertaking on the part of the government can be reasonably implied; and we submit that, under the conditions which the findings of fact here disclose, no such promise or undertaking can be implied, because the

government has expressly refused to use the explicit device for which compensation is here claimed; and having thus refused to use it, the only ground upon which liability can be claimed is, that in using the device which it has intentionally employed it has thereby unwittingly infringed the patented rights of Berdan.

*Mr. George S. Boutwell* and *Mr. Joseph H. Choate* for the Berdan Co. said as to the statute of limitations:

Upon this subject of the entirety of the contract, there is in this court a very instructive and quite conclusive case. In *Steam Packet Company* v. *Sickles*, 10 How. 419, at p. 440 to 441, the plaintiff had entered into a contract with the defendants for the use by the defendants of a certain patented machine of the plaintiff's upon the steamboat of the defendants, the purpose of the machine being to save fuel in the operation of the boats. By the terms of the contract the defendants were to continue the use on their boat " *during the continuance of the patent.*" The plaintiffs having sued without regard to the stipulations of the contract, and having threatened to bring an action *every week* to recover the amount due under the terms of the contract; and the court below having substantially instructed the jury that such an action *ad interim* would lie, this court, in holding such instruction to be error, said:

" If the plaintiffs had complied with the request of the president of the company, in a letter addressed to them on the 14th of April, 1841, after the dispute about the nature of the contract had arisen, and taken their cut-off from the boat, and thus put an end to the contract, the instructions given by the court would have been undoubtedly correct. But. as the record shows that the plaintiffs have refused to annul the contract, a very important question arises — whether this action and five hundred others, which the plaintiffs have expressed their determination to continue to institute, can be supported on this one contract. By the contract as proved and declared

on, the defendants, after the machine has been erected on their boat, are to continue to use it 'during the continuance of the patent,' if the boat should last so long. The compensation to be paid by the defendants is to be measured by the amount of saving of fuel which the machine shall effect. The mode of ascertaining this saving is pointed out, and the ratio in which it is to be divided. The first $250 saved are all to go to the plaintiffs, and three-fourths of all the balance. *But the contract is wholly silent as to the time when any account shall be rendered or payments made. The defendants have not agreed to pay by the trip, or settle their account every day, or week, or year; or at the end of 27½ weeks, the time for which this suit is instituted.* The agreement on the part of the plaintiffs is, that the defendants shall use their machine for a certain time, in consideration of which defendants are to pay a certain sum of money. *It is true the exact sum is not stated; but the mode of rendering it certain is fully set forth. It is one entire contract, which cannot be divided into a thousand, as the plaintiffs imagine.* If the defendants had agreed to pay by instalments at the end of every week, or twenty-seven weeks, doubtless the plaintiffs could have sustained an action for the breach of each promise as the breaches successively occurred. But it is a well-settled principle of law that '*unless there be some express stipulation to the contrary, whenever an entire sum is to be paid for the entire work, the performance or service is a condition precedent. Being one consideration and one debt, it cannot be divided.*' It was error, therefore, to instruct the jury that the plaintiffs were entitled to recover on the first count, if their machine was used by the defendants and was beneficial to them, without regard to the fact of the rescission, or continuance, or fulfilment of the contract on the part of the plaintiffs."

The question of the nature and of the entirety of the contract, being purely one of intention, the circumstances of this case and the transactions of the parties, coupled with the nature of the subject-matter of the contract and of the contemplated user, absolutely demonstrate that in this instance the

contract is entire for a continuous user during the life of the patent, and not a several and distinct contract in respect of each gun. The statute of limitations is therefore no bar to any part of the claim.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

Three questions are presented: First, did the court err in denying relief to the petitioner on the first cause of action; second, was the petitioner entitled to recover from the United States on the second cause of action; and, third, if so, was there any mistake in the amount awarded?

With respect to the first little need be said. The ninth finding is express, that the government never bought any guns from petitioner, (for the word "defendants" is obviously a clerical error,) and has never manufactured a gun after the model recommended by the Hancock board. It, therefore, never received any tangible property from the petitioner, nor ever trespassed upon any intangible right created by the patent. Beyond this it also appears that the patent was only for a combination, no single element of which was new; that it was intended for and was successful when used with rim-fire cartridges, and was not successful when used with centre-fire cartridges; that the government uses only the latter cartridges; that in order to adapt his patent to these cartridges the inventor added a new element for which neither singly nor in combination did he take out any patent. If, therefore, the government had used model No. 4, which was presented to the Hancock board, it would not have infringed any patent right. For where several elements, no one of which is novel, are united in a combination which is the subject of a patent, and these several elements are thereafter united with another element into a new combination, and this new combination performs a work which the patented combination could not, there is no infringement. Even if there were findings sufficient to show that the government had in any manner infringed upon this patent, there is nothing disclosing a contract, express or

implied, and a mere infringement, which is only a tort, creates no cause of action cognizable in the Court of Claims. *Gibbons* v. *United States*, 8 Wall. 269; *Morgan* v. *United States*, 14 Wall. 531; *Hill* v. *United States*, 149 U. S. 593; *Schillinger* v. *United States*, 155 U. S. 163.

With regard to the second question: It appears that Berdan invented the extractor-ejector; that he received a patent therefor and assigned such patent to the petitioner. It also appears that the government has made use of this invention, or at least one differing from it only in the substitution of a spiral for a flat spring. These springs "perform the same office and attain the same result in the same way," and the use of the one for the other is a "matter of choice, and is in no way material to the result." Upon these facts alone, thus briefly stated, the defendant, were it a private person, would be liable to an action of infringement. Nor would it be a defence to the action that such person had, subsequent to Berdan's invention, and without knowledge thereof, devised the contrivance which he was using. He would be in the attitude of a subsequent inventor, and the prior inventor is the one who, under the statutes, is entitled to the monopoly. Rev. Stat. §§ 4884–4886. "For any one invention but one valid patent can exist; and of several distinct inventors of the same invention one only is entitled to receive a grant of the exclusive right. This one is the original and first inventor." 1 Robinson on Patents, sec. 58. That the peculiar contrivance used by the government was devised by Adams, one of its employés, and that it differs from the Berdan invention in the use of a spiral instead of a flat spring, in no manner diminish the patent rights of Berdan or his assignee, the petitioner, or change the fact that the use made by the government of the extractor-ejector was an infringement upon such rights.

But as heretofore stated, something more than a mere infringement, which is a tort and not within the jurisdiction of the Court of Claims, is necessary to enable the petitioner to maintain this action. Some contractual liability must be shown. In *United States* v. *Palmer*, 128 U. S. 262, 269, it appeared that the petitioner was the inventor of certain im-

provements in infantry equipments; that he presented such improvements to a board of officers appointed by order of the Secretary of War to meet, consider, and report upon the subject of a proper equipment for infantry soldiers; that such board recommended the use of his improvements; and that the improvements were adopted by the Secretary of War as part of the equipment of the infantry soldiers of the United States army. Upon these facts the court found that there was an implied contract, Mr. Justice Bradley, speaking for the court, saying: "No tort was committed or claimed to have been committed. The government used the claimant's improvements with his consent; and, certainly, with the expectation on his part of receiving a reasonable compensation for the license. This is not a claim for an infringement, but a claim of compensation for an authorized use, two things totally distinct in the law, as distinct as trespass on lands is from use and occupation under a lease. . . . We think that an implied contract for compensation fairly arose under the license to use, and the actual use, little or much, that ensued thereon. The objection, therefore, that this is an action for a tort falls to the ground."

In the case at bar, according to the nineteenth finding, "Berdan, as an officer of plaintiffs herein, assignees of his inventions during the period covered by this action, was in constant communication with the ordnance officers, requesting the use of his devices by the government; they knew him as an inventor, and knew his inventions as soon as they were patented;" and, by the twenty-third, "plaintiffs have desired the government should use their patented devices, and have also desired and requested compensation for such use." So far, then, as the petitioner is concerned, the use of this invention was with its consent, in accordance with its wish, and with the thought of compensation therefor.

While the findings are not so specific and emphatic as to the assent of the government to the terms of any contract, yet we think they are sufficient. There was certainly no denial of the patentee's rights to the invention; no assertion on the part of the government that the patent was wrongfully issued; 1

claim of a right to use the invention regardless of the patent; no disregard of all claims of the patentee, and no use, in spite of protest or remonstrance. Negatively, at least the findings are clear. The government used the invention with the consent and express permission of the owner, and it did not, while so using it, repudiate the title of such owner.

The nineteenth finding, besides showing knowledge on the part of the officers of the government of Berdan's invention, states, in a general way, that "the attitude of the War Department towards inventors in ordnance has been one of neutrality; it has neither denied nor admitted the legal rights, if any there were, of inventors; in an endeavor to perfect the govern .ent arm that department has taken advantage of all knowledge within its reach and of all inventions; it does not deny the claims of inventors, but has proceeded upon the policy that executive officers should not decide upon such claims against the government or upon conflicting claims, but that the claim should be presented without prejudice before some other tribunal than an executive department."

The twenty-third finding discloses that while Berdan's application. for patent No. 88,436 was pending the Chief of Ordnance of the Army said, in substance, that if any of the features of that patent should be used by the defendant in the manufacture of the Springfield gun, the officers expected to recommend the payment for their use when the claims had gone through the proper channels and were settled; that the inventor wrote to the Chief of Ordnance asking the assistance of the War Department in securing speedy action on the pending application in the Patent Office, which letter was transmitted by the Secretary of War to the Secretary of the Interior, stating that "the early consideration of the aforesaid claims is regarded as being desirable."

By the same finding it also appears that this patent was exhibited in 1873, in competition with other guns, to a board of officers called the Terry board, detailed to inspect guns; that in the report of this board the device is fully described; that General Benét became Chief of Ordnance in June, 1874; "that he understood the Springfield device for extracting and

ejecting the shell, as described · in the 'Terry' report, as 'seemingly identical, certainly the mechanical equivalent' of Berdan's device for the same subject, covered by patent 88,436;" and also understood "that a use of an invention protected by a patent is the use of private property that must be paid for, and, therefore, an implied contract that has a place in court, and that if the validity of the patent is sustained, and its use by the government is proved to the satisfaction of the court, the inventor must be paid;" and "'with this understanding,' continued the manufacture of the Springfield gun, containing the disputed ejector and extractor device, after adjournment of the 'Terry board,' with the expectation that if the court sustained a claim by Berdan against the government upon his patent No. 88,436, then the government must pay him for the use of the invention."

The import of these findings is this: That the officers of the government, charged specially with the duty of superintending the manufacture of muskets, regarded Berdan as the inventor of this extractor-ejector; that the difference between the spiral and flat spring was an immaterial difference; that, therefore, they were using in the Springfield musket Berdan's invention; that they used it with his permission as well as that of his assignee, the petitioner, and that they used it with the understanding that the government would pay for such use as for other private property which it might take, and this, although they did not believe themselves to have the authority to agree upon the price.

These facts bring the case clearly within *United States* v. *Palmer, supra,* and show that the judgment of the Court of Claims was not founded upon a tort resulting from a mere infringement, but upon a contract to which both parties assented. That no price was agreed upon, or that the officers of the government were not authorized to agree upon a price, is immaterial. No price was fixed in *United States* v. *Palmer, supra,* or in *United States* v. *Russell,* 13 Wall. 623. The question is whether there was a contract for the use, and not whether all the conditions of the use were provided for in such contract. This is the ordinary rule in respect to the purchase of property or labor.

With regard to the third question, we are of opinion that the Court of Claims ruled correctly that the statute of limitations was a bar to any recovery for the use of the patented invention prior to six years before the action was commenced.

The Berdan device has been used by the government since January, 1869, and the petition in this case was filed July 26, 1887. Between January, 1869, and July 26, 1881, there were manufactured 224,952 muskets containing this device. Between July 26, 1881, and the expiration of the patent the number of muskets so manufactured was 159,940. The Court of Claims found that five per cent upon the lowest cost of manufacturing the musket during the period covered by this action was a fair and reasonable royalty.

One contention of the petitioner is that the contract, to be implied from the facts in this case, was entered into at the commencement of the use by the government of this patented device, and was a single contract in respect to the entire manufacture, under which no cause of action accrued to the petitioner until it was fully completed, and that therefore the statute of limitations began to run only from such time. The foundation of this claim lies in the fact that the blank form of proposal prepared by the Hancock board contained "the cardinal feature that the price should be fixed on a sliding scale — the more used the less rate ;" and that the proposition made by the petitioner was in exact response thereto, and named the prices graduated by the number of arms that should be manufactured, to wit, "two dollars per arm for the privilege of manufacturing 50,000 ; one and three-quarters dollars for the privilege of manufacturing 100,000," and so on ; and that all the offers made at the time were on some sliding scale of compensation.

It is further insisted that no other mode of determining the compensation was ever agreed upon between the parties; that the whole history of the transactions between them indicate that that must have been the mode contemplated by each ; that in the nature of things, and in accordance with the ordinary rules which control matters of this kind, the price should vary with the number or quantity, and that

until the government had ceased using the device, or at least until the patent had expired, there could be no satisfactory determination of what was a reasonable price for its use.

It is a sufficient reply that the proceedings before the Hancock board were abortive and resulted in nothing. The proposition made by the petitioner was never accepted, and the government never bought any gun from it or manufactured any like that recommended by the Hancock board. The proposition contemplated no rights other than the petitioner then had. It did not in terms, or by implication, extend to patents that it might thereafter acquire, and cannot be construed as underlying any action by the government commenced three years thereafter with reference to a different subject-matter. Because the petitioner, in 1866, offered the government certain patent rights at specified prices, it does not follow that those prices were to control in respect to other patent rights not then in existence, and which were subsequently tendered by it. If the prices are not to control, there is no reason for insisting that the other terms of the original proposition entered into the later transaction. When the negotiations of 1866 failed they failed for all purposes, and in the absence of some specific evidence indicating an intent to carry forward the terms of the proposition then made into the new arrangement of 1869, the conditions of this new contract must be determined by the circumstances which attended it.

But further, the negotiations of the Hancock board contemplated intermediate payments. In the blank form of proposal issued by the board was this provision : "Each payment, as above specified, to be made for not less than five thousand arms," and the same language was inserted in the offer made by the petitioner. Evidently the parties intended that any contract which might be entered into should provide for payments from time to time, such payments to be for not less than five thousand arms, and not for a single payment when the government had finished the use, or the patent had expired. And, of course, the moment any payment should become due, that moment, as to it, the statute of limitations would begin to run. Whatever, however, may

have been the thought of the parties in respect to the contract then proposed, the actual use by the government of the device covered by patent No. 88,436 was, so far as appears from any of the findings, upon no understanding that the prices named in 1866 for the device then tendered were to control, or that any sliding scale existed by which the price should be reduced as the number increased, or that the manufacture was to continue for any specified time, or that any particular number of muskets containing the device were to be manufactured. It was the use of the device in each single musket, with no other agreement or understanding than that a reasonable price should be paid therefor. It was like the ordinary purchase of a series of articles : no time for payment being named, payment is due for each article as it is delivered.

The case of *Steam Packet Co.* v. *Sickles*, 10 How. 419, 441, is not in point, for in that case the contract specifically provided that the machine should be used by the defendants during the continuance of the patent, and that after paying for its construction, the savings caused thereby in the consumption of fuel should be divided between the defendants and plaintiffs, one-quarter to defendants and three-quarters to plaintiffs. It was in view of this feature of the contract that the court said : " The agreement on the part of the plaintiffs is, that the defendants shall use their machine for a certain time, in consideration of which defendants are to pay a certain sum of money. It is true that the exact sum is not stated ; but the mode of rendering it certain is fully set forth. It is one entire contract, which cannot be divided into a thousand, as the plaintiffs imagine." But here there is no pretence that the government agreed to use in all its muskets this device ; or to continue the use of the device in any that it should manufacture during the life of the patent. There was no obligation on the part of the government as to time or number.

It is further contended that the royalty fixed by the Court of Claims is less than it should have been. In support of this contention reference is made to finding number twenty-two, which contains these statements :

" The cost of manufacturing the extractor-ejector now in use (since 1868) is $1.25 per gun less than the cost of manufacturing the Allin device. Several witnesses of high military position, experts in the practical use of arms of this description, and familiar with the cost of manufacture, have testified to the great value of the extractor-ejector device, claimed to be covered (and understood by them to be covered) by patent No. 88,436, and they are of the opinion that a reasonable royalty for the use of this device would be the saving in cost over the Allin device plus a sum varying somewhat with each witness, but of which the average is $1.41⅔ per musket, thus giving as royalty the sum of $2.66⅔ per musket. It does not appear upon what facts these witnesses based their opinions, or that they were cognizant of facts in relation to sales or licenses of this or other similar inventions upon which to found their opinions."

In this finding the court also states that it "finds the ultimate fact that five per cent upon the lowest cost of manufacturing the musket during the period covered by this action" was a fair and reasonable royalty. It gives the cost of manufacturing during the various years, and, in addition to the matters just quoted, the amount paid in other cases for the use of other devices in fire-arms. It also gives a table of the rates offered by the fifty-six different patentees of fire-arms to the Hancock board. Now, it may be that the finding as to the reasonable royalty is something in the nature of an arbitrary determination, and it is true that the court refers to the various matters above indicated as furnishing the basis upon which it reaches this conclusion, yet the question of a reasonable royalty is a question of fact to be determined by the Court of Claims, and its determination, as expressed in its findings, is conclusive upon us, unless from other findings it is apparent that there was error. We are not satisfied that there was any such error. The question is, what, under the circumstances, was a reasonable price to be paid by the government? It does not appear that there was any customary royalty, or that anybody, other than the government, has used this device. It is fair also to bear in mind that the particular structure which the government used was devised by one of its own

employés, and while the difference between it and the Berdan device ·is slight, and Berdan was the prior inventor, yet it is not unreasonable to take into consideration this slight difference between the two structures, and that the government constantly held to the specific device· invented by its own employé. The question is not whether, from the other facts stated in the findings, we should have reached the same conclusion as the Court of Claims, but whether, from such other facts, we can see that that court erred. We are not prepared·so to hold.

These are the only questions presented in this record, and, finding no error in them, the judgment of the Court of Claims is

*Affirmed.*

MR. JUSTICE WHITE took no part in the decision of these cases.