Green, Judge,
delivered the opinion of the court:
This is a suit to recover damages alleged to have been sustained by reason of an infringement of a patent upon a system of lubrication for internal combustion engines.
On August 8, 1911, Alfred B. Morse, now deceased, obtained a patent for Avhat was in general terms described therein as an improvement in automatic lubricators for motor-car engines. Certain transfers were made of the patent and Alfred B. Morse is now deceased with the result that the plaintiffs are now the owners of this patent. The alleged infringement of the patent by the Government occurred by reason of its manufacture and use of what was called the Liberty engine in aeroplanes manufactured for Avar purposes and which, as is universally known, were constructed in large numbers during the World War for use in Avar purposes.
*624 The Morse patent has now expired but there is no controversy in the case but that it was valid for the statutory period, although there is much dispute as to its scope. In fact the case turns on the question of what is covered by the claims set out in the patentee’s application for a patent, and whether the lubrication system used in the Liberty engine comes within the scope thereof. In order to determine this question it becomes necessary to more specifically describe the mechanism which was proposed to be used by the Morse intent and consider particularly the statements of the inventor as set out in the patent application.
It is urged on behalf of the defendant that the system of lubrication used in the Liberty engine is essentially different from that described in the Morse patent. The findings show that three general types of lubrication systems have been extensively used for internal combustion engines. These systems are particularly described in finding YII but in general terms it may be said that they are the sight-feed system, the splash system, and the force-feed system. It is not necessary to discuss the sight-feed system as there is no claim that such a system is described in the patent or used in the Liberty engine.
The force-feed system is one in which the oil is forced .by a pressure pump from a reservoir into a plurality of ducts or pipes leading to the various bearings and points of the engine to be lubricated, the excessive amount of oil draining or flowing into the bottom of the crank case, from which it is removed for recirculation. There is little if any controversy as to the force-feed system being used in the Liberty engine and the findings so state, but it is contended on behalf of the plaintiffs that the patent covered certain features of the force-feed sjsstem as used in the Liberty engines and by reason thereof the patent was infringed. We will next consider this contention.
While the patent was described as an automatic lubricator for motor-car engines, the patentee stated expressly that his invention was “ not restricted to any particular kind of engine or field of work.”
The splash system of lubrication, as shown in the findings, is one in which a pool of oil is maintained at a constant level *625 in the crank case, into which the lower end of the connecting rods dip during a downward portion of their revolution, such dipping acting to forcibly splash the oil into a spray or mist which fills the crank case and thus gives lubrication to all moving parts therein whether dipped in oil or not. The Morse patent made use of the splash system and recited:
“ It is not new to employ a splash system of lubrication, but it is new to maintain a proper level at all times, irrespective of the position of the vehicle, whether going up a side hill or transversely thereof, or upset, and I accomplish this automatically without indicators, and so that there is always a proper level at each end of the crank case, whatever may be the operative inclination of the vehicle.”
It will thus be observed that what was new and therefore patentable in the Morse invention was the feature of maintaining a proper level of the pool of oil in the crank case. The description of the splash system set out above shows plainly that the maintenance of the proper level of the oil in the crank case is necessary to the effective operation of the system, for if there was no pool of oil into which the cranks could splash, there would be no lubrication.
Other language contained in the patent in suit further emphasizes the fact that the combination presented thereby made use of the splash system. Lines 32-41 (page 1) of the patent recite:
“ I provide an oil supply in the crank chamber, into which the cranks dip to just the right extent to keep the engine ■properly lubricated, the rapid splashing of the cranks dividing the oil into a spray or mist of oil, which gives perfect lubrication of all moving parts without any danger of excess, inasmuch as the oil is always maintained at exactly the right level.’’'’ (Italics ours.)
Further on it is specified that-—
“ The height of the oil in the crank chamber, as already stated, depends on the height of the overflows 8, * * *. I believe it is new to maintain the oil at an unvarying level so that thereby the result of the splashing of the oil is kept absolutely uniform, while at the same time providing means to prevent the flooding of the crank case with oil from the oil chamber in case of an'overturn of the vehicle.” (Italics ours.)
*626 The manner in which the invention of Morse, as described in the patent, operated is well shown by a portion of finding VIII, in which it is stated that—
In the preferred embodiment the patentee discloses an internal-combustion engine having a pool of oil maintaining a constant level in the crank case, into which pool the crank shaft and the lower end of the connecting rods dip and splash. The crank case is divided by means of a partition into two compartments, and an oil level is maintained by means of two standpipes, one at either end of the crank case and in each compartment. These two standpipes are both connected to the suction end of an oil-evacuating pump of the gear type, this pump functioning to remove any excess of oil above the prescribed level to a reservoir contained in the lower portion of the crank case. A second gear pump of a smaller capacity than the evacuating pump is arranged to withdraw the oil from this reservoir and to force the same under pressure through suitable ducts back into the crank case. Each of the ducts leading from the crank case to the evacuating pump is equipped with a barrier valve to prevent oil from flowing back into the crank case if the engine is submitted to an unusual inclination at a time when it is not running and the evacuating pump therefore not functioning.
Although the patent does not explicitly so state, it is evident from this description and the diagrams attached that the pool of oil in the crank chamber which is said to be maintained at a constant level, is in the lower part of the engine case, as the vehicle containing the engine is ordinarily operated. It is difficult to understand how, when a vehicle is upset and the lower part of the crank case becomes with reference to the position of the earth the upper part thereof, the oil in the crank chamber would not obey natural laws and descend into what had theretofore been the upper part of it, for although there were compartments in the lower part of the crank chamber all of these compartments were open above. As long as the engine remained in its ordinary position with reference to the earth or somewhere near it, the oil would remain in the bottom of the crank chamber at practically the desired level, but if the position of the upper *627 and lower parts of the crank case was entirely reversed it would seem plain that this condition could not be maintained. It is not necessary, however, for us to determine whether the mechanism described in the Morse patent and the combinations set forth therein would effectuate all that was claimed by the patentee for in the view that we take of the case, as hereinafter set out, there was in no event any infringement of the Morse patent.
At the time of the submission of the case the plaintiffs’ counsel had withdrawn part of the claims which were alleged by the original petition to have been infringed and those now relied upon are as follows:
“ 4. In an apparatus of the kind described, the combination of a crank case, an oil receptacle supplemental to the crank case, a return duct through which surplus oil may flow in passing from the crank case to the oil receptacle, and means for preventing the back flow of oil through said return duct to said crank case in case the crank case and oil receptacle are accidentally inverted.
“ 8. In an apparatus of the kind described, the combination with an engine and a movable part thereof, of an oil chamber into which said movable part moves, an oil supply chamber beneath said oil chamber, and pumping means for controlling the flow of oil in either direction between said chambers and maintaining a continuous circulation of oil between said chambers.
“ 10. The combination with an engine having a movable part, an oil chamber into which said part moves for delivering oil to the engine, an oil supply chamber adjacent said oil chamber, pumping means to pump the oil from said oil chamber into said supply chamber, and pumping means to pump the oil from said supply chamber back into the oil chamber.
“ 21. The combination with an engine and its cranks, of a crank case about said cranks, transversely divided into a plurality of compartments, means for withdrawing surplus oil from each compartment into the supply chamber, said withdrawing means being provided with means for preventing the reverse flow therethrough of the oil, and automatic means for maintaining oil delivery from the oil supply tank into each compartment of the crank case.”
Taking up these claims in order we find that there is nothing claimed to be new in the combination set out in no. 4 except what is referred to as “ means for preventing the *628 back flow of oil through said return duct to said crank case in case the crank case and oil receptacle are accidentally inverted.” The “ combination of a crank case [and] an oil receptacle supplemental ” thereto, with a return duct through which surplus oil may flow in passing from the crank case to the oil receptacle, was not new nor did it require any inventive capacity. But it seems to be claimed that having added to the combination the feature first stated, a patentable novelty is brought into existence. In the Morse patent it is stated that the back flow is preferably prevented by equipping the ducts leading from the crank case to the evacuating pump with a barrier valve, but it is now argued that although the drawings attached to the specifications showed the barrier valves, in fact the return flow was prevented by the gear pump used as shown by the drawings; that as the Liberty engine also used a gear suction pump for the purpose of evacuating the oil, it likewise used what counsel term a “ barrier ” pump, because it would prevent the flow back into the engine chamber, and thereby infringed the Morse patent. We think it clear that unless the mere use of a gear pump for the purpose of removing the oil from the crank case (a matter which we will discuss hereinafter) constitutes an infringement, the fact that any such pump would obstruct the flow of oil from the supply chamber back into the crank case would not constitute an infringement of a patentable feature. Gear pumps, such as were used in both the Liberty engine and under the Morse patent, are old devices which far antedate the Morse patent. Any kind of a pump would obstruct the flow in a direction opposite to that in which it moved the liquid when it was operated, and gear pumps used under either system would for practical purposes completely obstruct it. But the fact that pumps do so act would not prevent anyone from using them for the ordinary purposes for which pumps are constructed. In other words, the stoppage of the back flow by a pump is as old as the invention of the pump itself. For this reason no valid patent could be taken out on the principle that a pump moved liquids in one direction and prevented their flow in another, nor could there be anything new in the use *629 of a pump to withdraw oil from a receptacle; that is what suction pumps are for.
If the claim can be held to cover the barrier valves which were mentioned only in the specifications, it then must be noted that the Liberty engine contained no barrier valves or their equivalent.
There is some argument on behalf of plaintiffs based on the fact that in the Liberty engine the pumps used for evacuating the oil from the engine were of greater capacity than those used to supply it with the oil, or, in other words, are what is called in plaintiffs’ argument “ differential pumps ”, and that this feature was covered by the Morse patent. The claim of infringement thus raised will be discussed hereinafter in connection with claim 21. At this point, however, it should be noted that the claims now relied upon as a basis for the suit state nothing with reference to the pumps being of different capacity. This statement, or its equivalent, is found only in claims 1 and 2 which have been abandoned presumably for the reason that the combination stated therein was plainly not one used in the Liberty engine.
Two of the other claims now relied upon, namely, nos. 8 and 10, may be considered together. In both claims the combination is said to include an engine with a movable part, which of course all engines have. No. 8 includes “ an oil chamber into which said movable part moves.” No. 10 adds to this last statement the words “ for delivering oil to the engine.” This is somewhat confusing, but we suppose reference is intended thereby to an engine with a crank case in which the cranks move and are supplied with oil. No. 8 specifies an oil supply chamber beneath the oil chamber (crank case). No. 10 specifies an oil supply chamber adjacent to the oil chamber. No. 8 specifies pumping means for controlling the flow of oil in either direction between said chambers and maintaining a continuous circulation of oil between said chambers. No. 10 specifies “ pumping means to pump the oil from said oil chamber into said supply chamber, and pumping means to pump the oil from said supply chamber back into the oil chamber.” Neither of these claims *630 mentions the compartments in the “ oil chamber ” (crank case). In this connection it should be observed that while claim no. 10 describes an oil supply chamber “ adjacent said oil chamber ” the plans of the Liberty engine require that the supply chamber should be remote from the engine and the oil chamber. The purpose of the location under the Morse patent as recited in the specifications was to prevent “ chilling of the oil ” “ even in the coldest weather ”, while in the Liberty engine the purpose was to keep the oil cool by avoiding the heat of the engine.
These two claims are not materially different. There was nothing new in having a crank case which enclosed the most of the moving parts of the engine, nothing new in having a supply chamber of oil from which oil was taken by a pump and applied in various ways to these moving parts. Calling the crank case an “ oil chamber ” does not change its nature, although as a matter of course any chamber into which oil was fed would contain oil. We do not understand that plaintiffs base their allegation of infringement on any of these matters but upon the fact that under the Morse patent a pump was used for feeding oil into the crank chamber and another pump was used for the purpose of withdrawing the oil therefrom. The use of a pump for feeding oil into the crank case was certainly old, and it would seem that if it was desired to have some positive method for removing oil from the crank case the use of another pump for that purpose would at once suggest itself to any skilled mechanic. We are unable to see how the Morse patent can be broadened to cover any and every method of withdrawing oil from the crank case in which a pump is used. Moreover, the patent would cover only such a combination as was actually effected under the claims and the specifications, namely, one where after the oil reached a given height in the engine case it flowed through a standpipe which conveyed it to the evacuating pump; whereas in the Liberty engine the surplus oil by force of gravitation went to one end of the engine case or the other according to the manner in which it was tilted and a pump at each end removed whatever oil accumulated in the. sump or depression there located. The purpose of *631 the combination in the Morse patent was to prevent the withdrawal of an undue amount of oil from the crank case or chamber leaving a pool of oil in which the cranks splashed. In the Liberty engine the purpose was to withdraw as completely as possible the oil from the engine chamber after it had been applied where necessary by means of the force-feed system. It is argued on behalf of plaintiffs that the Liberty engine accomplished its lubrication in part by a mist of oil in the chamber such as arose from the use of the splash system in the Morse patent. There is nothing in the evidence that shows that the force-feed system used in the Liberty engine was intended to effect lubrication by any such means, or that the system would have such effect. On the contrary, the purpose (very different from that under the Morse patent) was to effect the desired lubrication by a direct application of the oil to the parts sought to be lubricated. In any event the method of accomplishing lubrication was so different that it could not constitute an infringement.
The argument on behalf of plaintiffs with reference to claims 8 and 10 when brought to its logical conclusion is to the effect that the patentee had a patent on a circulatory system consisting of a pump that supplied oil to the crank case and another that removed it therefrom. We have already stated in our opinion that there was no new invention in this. Moreover, we think it clear that Morse could not have a valid patent on the function of having oil supplied to the crank case and removed therefrom. The validity of the patent must depend upon the combination and its functions or the result of the combination could not be made the basis of a valid patent. We find nothing in claims 8 and 10 which would show an infringement of the Morse patent by the Liberty engine. The mere fact that the Liberty engine used some elements of the combination set forth in the Morse patent was not an infringement, especially when they were used with other elements in a different combination. Stimpson v. Bal. & S. R. Co., 10 How. 329. Besides this, the combination used in the Liberty engine by adding-other elements performed a work which the patented com *632 bination could not, as is shown elsewhere in this opinion. This was no infringement. United States v. Berdan Fire Arms Co., 156 U.S. 552.
Claim no. 21 describes a combination in which the crank case is divided into a plurality of compartments with means for withdrawing surplus oil from each compartment into the supply chamber and preventing the reverse flow of oil, and it is said that this feature of the Morse xDatent was infringed.
So far as the plurality of compartments is concerned there were none in the Liberty engine nor any need of any under the lubrication which is used. In the Morse system the compartments were useful as tending to prevent too great a change iii the level of the oil in the crank case on occasions when the engine was tilted. In the Liberty engine the effect of the combination was to make it immaterial how much the engine might be tilted.
The patentee Morse in a suit against the Winton Motor Carriage Company we think stated the case properly as follows:
“ But where there is no pool of oil carried at all in the case, and it can leak out as fast as it goes in, and they do not maintain a pool of oil by a fixed outlet, nor maintain a predetermined level for the oil, I do not then consider it as an infringement.”
This admission against his interest we think is entitled to much weight. It makes it clear that the patentee had no thought of taking out a patent on the use of a pump to remove oil from the crank case, nor do we think such a patent could be valid unless the pump was of some new kind invented by the patentee. But the gear pump used in the Liberty engine was of a kind which had been used years before the Morse patent in slightly varying forms. There is no claim of invention with reference to the pump itself, and the claims in the patent which refer to the method of evacuating the oil from the crank case are based on a combination which was not used by the defendant.
The specifications of the Morse patent state that the check valves referred to above are preferably interposed to *633 prevent any back flow in the passages leading to the engine case, but the specifications also recite tbat the “ interposed pump prevents the free flow of oil either to or from the crank chamber.” The specifications of the patent do not contain any explanation of why the check valves are preferred, but possibly it is because of the fact that when the engine was inverted or tilted at certain angles there might be more or less of a back flow through the pump if a plunger pump was used. In an engine which the patentee constructed in accordance with his system and operated, a pump of the plunger type was used. But as has already been stated, the use of a different kind of pump in the Liberty engine would not constitute an infringement even though its construction was such as to prevent a back flow. Moreover, the check valves are not mentioned in any of the claims set forth in the patent but merely in the specifications.
It is also urged on behalf of plaintiffs that the Morse patent disclosed a double-pump system in which one pump was used for the purpose of supplying oil to the crank case and the other for withdrawing it and that these pumps were of different capacity, the one used for evacuating the oil being the larger. The Liberty engine also used larger pumps for withdrawing the oil from the crank case, and it is said that this constituted an infringement of the novelty of using “ differential ” pumps in an oil-circulating system. We have hereinbefore stated that in our opinion there was no novelty in the combination of using one pump for supplying oil to the crank case and another for removing it, nor does it seem to us there was any novelty in providing that the evacuating pump should bring the oil back to the supply chamber, thus providing a circulatory system. Such a system had been in use prior to the Morse patent but the oil was returned to the supply chamber by gravity and thus differed from the system used in the Morse patent. The use of a pump to force oil into the crank case was old and we think that in case it was desired to have some positive method for removing oil from the crank case the use of another pump for that purpose would suggest itself to any skilled mechanic. The findings show that prior to the effective date *634 of the Morse patent no lubrication system had been disclosed by patent or publication which used not only a pump for supplying oil to the crank case but also one of greater capacity for evacuating it therefrom. But we do not think this was a patentable feature except in connection with a combination and, as we have already observed, the combination in the Liberty engine was quite different from that used in accordance with the Morse patent.
There is much in the opinion rendered in the case of Curtiss et al., Trustees v. United States, 75 C.Cls. 286 (certiorari denied), that is applicable to the case now before the court. In fact we think it is controlling. In the Curtiss ease, the action was based on a patent for a new improvement in lubricating systems for motors and particularly for motors employed in aircraft. Like the system employed in the Liberty motor it was intended to minimize the difficulties in the lubrication of motors for aircraft regardless of whatever position might be assumed in flight. The alleged infringement in that case as in the instant case arose from the use of the Liberty engine. So also under the Curtiss patent and the Liberty engine there was a combination of pumps used to force oil to the bearings desired to be lubricated and remove the oil after being used from the crank case. As in the case at bar, it was necessary to care for this accumulation of drippings in the crank case, especially so when the motor assumed sharp and varying angles from the horizontal and also as was stated in the opinion:
“ It was well known to the prior art that if the motor were inclined upwards the oil would accumulate in the rear of the crank case and vice versa, the effect being that the excess quantity of oil in one end of the case would overlu-bricate the adjacent parts, possibly stall the engine, and foul the spark plugs, a condition fraught with hazards and danger, for it is obvious that an excess quantity of oil in one end of the crank case and substantially none in the opposite end material^ interfered with the operativeness of the motor and constituted a fruitful source of trouble if not a complete impediment to normal functioning.”
Further with reference to the scavenging pumps that were employed both by Curtiss and the Libertjr motor, the court said:
*635 “ * * * it is apparent that a change in attitude [change of angle from horizontal] of the airplane will expose one-intake of the patentee’s pumps to air alone. When the airplane is inclined to an acute angle oil accumulates at the-bottom end of the crank case, and the intake pipe for the-front-end pump is exposed exclusively to air.”
It may well be noted here that in the submission of the Curtiss case many patents were referred to as showing prior use of the same system as that embodied in the Curtiss patent, but no reference was made to the patent upon which suit is brought in the case at bar probably for the reason that no one connected with the Curtis case thought that the use of a pump to remove oil from the crank case involved, anything beyond ordinary skill and that no patent could be-based upon it. On this point the court said:
“ The difference between invention and the exercise of mechanical skill is not always easily discernible. Invention, concededly involves the creative faculty, an exercise of the-mental processes to evolve some original thought or discovery. Mechanical skill, at least as to one manifestation,, consists in part at least of taking from the art elements that are old, whose inherent qualities are well known and by a suggestive combination, itself familiar, rearrange and relocate them so as to produce a more useful form. Pumps and their functioning elements were very old. It was long-known in the art that excess oil in a crank case occasioned by drippings from the lubricated parts of a motor was subject to removal by adaptation of pumps thereto. The use of pumps of a different capacity for this purpose was likewise old and the system of lubrication disclosed by the patent in suit was known. The art was a crowded one, and with the-teachings of prior patents and the discussion and disclosures of what had been and could be done it seems to us that, the patentee in this suit did no more than create by rearrangement and relocation of old elements a system which may have functioned advantageously without in the least introducing into the art a new, novel, and original system off lubrication undiscovered prior thereto.”
It may be objected that when the court said in the Curtiss ease that “ pumps and their functioning elements were-very old ” and that it was long known that the excess oil in a crank case was subject to removal by the adaptation off pumps thereto, and also that the “ use of pumps of a different capacity for this purpose was likewise old ”, it had. *636 reference to the time when the Curtiss patent was taken out, which was later than the Morse patent. But the court said further on:
“ To locate pumps adjacent to accumulated ftwids in order to remove them is not invention. It is a process which, because of its age, would suggest itself to one skilled in the art. If a single pump was inefficient for the designed purpose it is difficult to ascribe invention to the employment of two or more functioning for the same purpose; ”
and if the use of two instead of one shows no new invention it would seem clear that where a larger pump is used instead of two pumps there would likewise be no new invention. (Italics ours.)
In the Liberty engine the pumps were not designed to keep the oil at a predetermined level but to remove all of the oil from the crank case as fast as it came from the bearings, upon which it was forced by the pressure feed. In the Liberty engine, as before stated, the surplus oil collected in small depressions or sumps, one at each end of the crank case, and was removed therefrom by the evacuating pumps. Each of the evacuating pumps was larger than the supply pump in the Liberty engine, and this was necessary for the reason that the Liberty engine was designed to be used in an aeroplane. When the aeroplane was tipped at a high angle or completely inverted, as is often necessary in actual combat, there would be little or no oil in the sumps upon which the pumps could operate. When the plane came back to a normal position on a level, horizontal or nearly so, there would be more oil to be removed and the larger size of pumps would insure the complete scavenging of the crank case. The special feature of the Morse patent, as stated in the specifications, was the maintenance of an oil level in the ■crank case, which was absolutely necessary in order that lubrication should be effected under his system. This was neither necessary nor desirable in the Liberty engine. The testimony shows that if this level was maintained in the Liberty engine, as described in the Morse patent, the engine would be over-lubricated and could not work effectually. On the other hand, it would seem quite evident that the Morse combination could not be used in an aeroplane for the *637 reason that wben the engine was tilted at a high angle the bearings and moving parts would be insufficiently lubricated and when the aeroplane was inverted the oil in the pool would go to a part of the crank case where it was not wanted, obstruct the operation of the engine, and some of the moving parts would be insufficiently lubricated, or not lubricated at all. The specifications of the Morse patent indicate very clearly that he did not contemplate the use of his system in an aeroplane.
We think the evidence shows clearly that certain devices which were used under the Morse patent and which were absolutely necessary to its successful operation, were not used at all in the Liberty engine, and that the main device for lubrication in the Morse engine was totally different from that in the Liberty engine; in short, that the combination of elements for the purpose of lubrication in the Liberty engine included devices not covered by the Morse patent and excluded certain elements or devices which were included therein and a necessary part thereof. Under such a state of facts, we think it is not necessary to further cite authorities to show that the Morse patent was not infringed by the use of the Liberty engine.
It follows that plaintiffs’ petition must be dismissed and it is so ordered.
Whaley, Judge; Williams, Judge; Littletox, Judge; and Booth, Ghief Justice, concur.